Jackson v. Grissom.

---

MARY A. JACKSON, Appellant, v. GRISSOM et al.

Division One, May 30, 1906.

1. **ABSTRACT: Size of Type.** The rules of this court require abstracts to be printed in "fair type." That does not mean nonpareil.

2. **Confidential Relation: Fraud: Innocent Purchaser: Voluntary Conveyance: Laches.** Hunt, claiming to be a lawyer and physician, sustained confidential relations with Whitwell, and secured from his wife $1,000, and from the devisees of Horner a deed to lands in Missouri and in Tennessee, under an agreement in writing that he was to hold the lands in trust to secure the repayment to her of the $1,000 after he had settled with Horner's Tennessee heirs, who had been disinherited by the will and were contesting the same. He obtained a release from the Tennessee heirs of all claim to Horner's lands there, and sold them for $500 and kept the money. He also obtained a release from them to the Missouri lands and dismissed the

suit contesting the will, which judgment was afterwards at the suit of Horner's devisees set aside as having been obtained through fraud and without the knowledge of the devisees, and the will established. Hunt paid nothing for the deed to him, but transferred the lands to Bedford who knew of his fraudulent schemes and shared in them, Bedford deeded them to Jackson, who also shared in Hunt's fraudulent transactions and knew all about them, and he transferred them without consideration to his wife in 1891, while the suit in the Federal court to set aside the fraudulent judgment was still pending, and she now brings suit against the grantees of the devisees to ascertain, determine and quiet the title. *Held*, first, that she is not an innocent purchaser; *second*, that her claim is stale; and, *third*, that the trust deed should be dug up root and branch.

Appeal from Stoddard Circuit Court.—*Hon. J. L. Fort,* Judge.

AFFIRMED.

*N. A. Mozley* for appellant.

*Wilson Cramer* for respondents.

LAMM, J.—Mary A. Jackson claims to be the owner of the hereinafter mentioned realty, and at the September term, 1900, of the Stoddard Circuit Court, instituted a suit against twenty-five defendants, the object and general nature of which was to try, ascertain and determine the estate, title and interest of the plaintiff and defendants, respectively, in 213 acres of land in said county, described as follows: the southeast quarter of the northeast quarter and the northeast quarter of the southeast quarter of section 11, and the south half of the northwest quarter and the north half of the southwest quarter, and thirteen acres in the west part of the southwest quarter of the northeast quarter of section 12, township 28, range 10, excepting three acres situate in said northeast quarter of southwest quarter of section 11, which excepted land is described

196 Sup.—40

by references to conveyances therein pleaded by date and record.

Of this aggregation of defendants, only two made defense, to-wit, Milton A. Grissom and David A. Glenn, and their answer was a general denial coupled with affirmative pleas, one being that they owned the fee in the premises, another being the Statute of Limitations, and for a further defense the answer set forth a state of facts best shown by itself, as follows:

"And for another and further answer defendants allege that plaintiff and these answering defendants claim under John H. Horner, deceased, as the common source of title; that these defendants claim under the will of said deceased, duly admitted to probate in the probate court of Stoddard county, Missouri, and by conveyances from the devisees therein, and that the pretended claim of this plaintiff is based upon an instrument of writing purporting to have been executed on the 26th day of June, 1885, by the heirs and devisees of said John H. Horner to one Andrew W. Hunt, and recorded in the land records of Stoddard county in book 8 at page 342, under and by virtue of which the said Hunt pretended to be the owner of said premises. And that these answering defendants further state that the said instrument of writing of June the 26, 1885, is without consideration and fraudulent and void, and was procured by said Hunt by fraud, imposition and deception. That at the time of the execution thereof there was pending in the United States Circuit Court for the Eastern Division of the Eastern Judicial District of Missouri, an action brought by the heirs at law of the said John H. Horner, deceased, residing in Tennessee, against the legatees and devisees under his will, to contest said will and to have the paper purporting to be the last will and testament of said deceased declared not to be his last will and testament.

"That the said Andrew W. Hunt, who was then a practicing attorney in Stoddard county, Missouri, for

the purpose of inducing said devisees and heirs of John H. Horner, deceased, to execute to him the aforesaid instrument of writing fraudulently promised and represented to them that, if they would furnish him $1,000 in money, he would go to the State of Tennessee and compromise with the Tennessee heirs of said Horner and obtain from them a deed of conveyance or release to said devisees under said will of all the property devised to them by said will and a dismissal of said will contest.

"That thereupon, in view of such undertaking of said Hunt, and relying upon his promises and representations, the mother of said devisees, Mary J. Whitwell, paid over to said Hunt the sum of $1,000 for the purpose aforesaid, and the devisees were induced by him to execute the aforesaid paper of June 26, 1885, upon the pretense and representation that the same was executed to secure the said Mary J. Whitwell for the money she had advanced.

"That the parties executing said paper had the utmost confidence in said Hunt and relied implicitly upon his statements and representations and did not know until long afterward that said Hunt pretended to claim any interest to said land by virtue of said instrument.

"And defendants further state that the said A. W. Hunt used the money so advanced to him by the said Mary J. Whitwell in compromising with the Tennessee heirs, but instead of taking a conveyance or release to the devisees under said will, fraudulently took such conveyance to himself and placed the same of record in the land records of Stoddard county.

"And these defendants further state that the said A. W. Hunt subsequently executed a conveyance or conveyances to H. H. Bedford who thereupon executed deeds to R. J. Jackson from whom this plaintiff pretends to have acquired title.

"That the said H. H. Bedford, R. J. Jackson and this plaintiff at the time of receiving the several con-

veyances under which they claimed, had full knowledge and notice of the deceit and fraud practiced by said Hunt as aforesaid, in procuring his pretended title, and that the conveyance from the said R. J. Jackson to this plaintiff, Mary A. Jackson, is a voluntary conveyance without consideration. Wherefore defendants pray judgment for all proper relief.''

To this answer, plaintiff replied by general denial.

The cause was tried in March, 1903, and the court found against plaintiff and all the defendants except David A. Glenn. As to said Glenn, it found him the owner in fee of the premises and entered its decree accordingly, from which plaintiff appealed.

This was an equity case and rule 7 of this court requires that in cases of equitable jurisdiction the whole of the evidence shall be embodied in the bill of exceptions, provided, however, that it shall be sufficient to state the legal effect of documentary evidence where there is no dispute as to the admissibility or legal effect thereof.

Appellant's abstract somewhat violates the foregoing rule and does not comply with another rule of this court, in that, say, 54 pages of it are set in non-pareil type — a kind of type quite too small to read with either comfort or certainty with the natural eye, or by artificial aids, in daylight. With artificial light the difficulty is aggravated in the case at bar by using, instead of rough or antique finished paper, a paper known to the trade as ''machine finished,'' or ''sized and super-calendered'' paper — a glazed paper torturing to the human eye by gas or electric light and out of place in brief work.

Our rules require abstracts shall be printed in ''fair type'' (rule 13). The statutes, out of tenderness to the professional eye, and that of the general reader, require our reports to be published in a type equal in size to the fortieth volume of Iowa reports (R. S. 1899, sec. 1658) i. e., ''long primer.'' Out of

tenderness to the legislative eye and to that of the general reader, the statutes require that bills, reports, communications and other legislative documents and reports be printed in "small pica." [R. S. 1899, secs. 9015 and 9016.] Now, the type used here is five points smaller than "small pica" and four points smaller than "long primer," nor is it "fair type" (in any fair sense), and its use seems precluded by several rules; for instance, by rule 13, supra, by the legislative rule, supra, by the rules of comity, as well as the rules of safety. Because, if its use be indulged, then, to the dangers now recognized as incident to every lawsuit there will be added an insidious and (possibly) *new* danger, to-wit, the danger of the judicial eye's being unable to see (and, hence, the judicial mind's overlooking) points made and relied on by learned counsel.

### STATEMENT OF FACTS.

John H. Horner is the common source of both plaintiff's and Glenn's title, plaintiff claiming title through one Hunt (alleged to be grantee of the devisees under Horner's will), and his vendees. Defendant Glenn claims title by conveyances directly from said devisees and by mesne conveyances.

Doing the best we can with the record, it may be said there was evidence tending to show that John H. Horner came to Missouri from west Tennessee, leaving his mother, brothers and sisters behind him. He was at outs with his immediate family, was unmarried, was in indifferent health, and after coming to Missouri substantially made his home for a long time with Captain W. H. Whitwell and Mary Jane, his wife, in the town of Advance in Stoddard county. In some way, by marriage or collaterally, he was related to them, or either of them. In December, 1876, Horner sickened and died, testate, seized and possessed of several thousand dollars worth of real estate and personal prop-

erty in Missouri and Tennessee, including the Stoddard county land involved in this litigation. Shortly prior to his death, he executed his last will and testament whereby he named, and substantially disinherited, his mother, brothers and sisters and left a legacy of $500 to Mary Jane Whitwell and the residue of his estate to the three youngest Whitwell children — appointing Captain Whitwell executor. This will was duly pro-bated in common form in the probate court of Stoddard county, and possibly recorded in Tennessee. Presently after its probate, a will contest was instituted in Stoddard county and litigation pertaining to the same also instituted in Tennessee by the mother, brothers and sisters of testator. Touching the history of the Missouri will contest, it may be said there was a mistrial, a change of venue, a removal into the circuit court of the United States at St. Louis, and there the cause was pending in the year 1885, and was disposed of as presently shown. Early in 1885, or late in 1884, Andrew W. Hunt appeared on the stage. Precisely why he appeared is somewhat vague. He, himself, hazards two versions of it. In his answer, filed *pro se* in certain litigation in said Federal court, he averred the truth to be as follows: ''That defendant'' (said Hunt) ''was temporarily in Advance upon matters of business in no way connected with complainants or said will contest action.'' On the stand, however, he said he was written to by Captain Whitwell and offered a fee of $500 and his expenses to come from Tennessee and assist as an attorney in the defense of the will in the Federal court, and came to Missouri on that errand. It seems that Captain Whitwell was a veteran Confederate soldier who lost a leg during the Civil War, and it seems that Hunt was of a musical turn and blew a horn in the service during the same war. When peace returned he straightway became a doctor, and, we infer from his evidence, a good one. Enamored presently of the law, he afterwards became a lawyer,

and, we infer from his assertions preserved in the record (still blowing a horn?), a *sound* lawyer. *Vide,* the following excerpt from the record:

"Mr. Cramer: Now, if the court please, I desire to interpose an objection that he is not competent to testify in this case. Where is the statute?

"Mr. Hunt: You need not get the statute; *just state what it is and I will tell you whether or not it is the law—I know the law.*"

Off and on, thereafter, Dr. Hunt mixed medicine with law in his practice, or practices. When he first came to Missouri he made his home with the Whitwells and busied himself about the will contest, and afterwards his family came and he and they continued to board with the Whitwells for a space of time without money and without price. He arrived, say, in March, and by June 26, 1885, his plans seem to have been ripe, since he drew and procured Captain and Mrs. Whitwell and the devisees and others interested under the Horner will to execute two unique instruments — unique in complications (spider webs), as well as tenor and effect. Both of these instruments were duly acknowledged and will hereinafter, for convenience, be referred to as instruments "A" and "B." They refer to the same matter, were executed at the same time and self-evidently are part of the same arrangement.

Instrument "A" was at once placed of record in Stoddard county and is the foundation of plaintiff's alleged title. Omitting acknowledgements and signatures, it is as follows:

"This indenture made and entered into June 26, A. D. 1885, by and between W. H. Whitwell and Mary J. Whitwell, his wife; Chase Gibbs and Elizabeth Gibbs (formerly Elizabeth Whitwell), his wife; D. W. Revelle and Henriette Revelle (formerly Whitwell), his wife; Randolph Revelle and Josephine Revelle (formerly Josephine Whitwell), his wife; J. F. Boss and Marsella

Boss (formerly Marsella Whitwell), his wife; and A. Sidney Whitwell, being legatees and husbands and heirs of legatees of the estate of the late J. H. Horner, under his will made in Stoddard county, Missouri, December 30, 1876, to which reference is hereby had, the parties of the first part; and A. W. Hunt, the party of the second part; all of Stoddard county, Missouri,

"Witnesseth, that for and in consideration of the sum of one dollar paid unto the parties of the first part, by the party of the second part, the receipt whereof is hereby acknowledged, the parties of the first part have granted, bargained and sold and by these presents do grant, bargain and sell, remise, relinquish and convey unto the party of the second part, his heirs, and assigns forever, all the estate, right title, interest, claim and demand of the parties of the first part, in and to the estate of the said J. H. Horner, deceased, and to all actions, rights of actions, and all equities, law suits, cases or controversies, connected with or which relates to any and all parts of said estate and to all property in (away) whatsoever involved in any of said law suits, cases or controversies,

"To have and to hold unto the said party of the second part, his heirs and assigns, together with all the rights, interests, claims and demands, of what nature and kind soever of the parties of the first part, and of either of them forever.

"On condition, nevertheless, that in the event the parties of the first part or either of them shall so elect, and do pay unto the party of the second part his heirs or assigns, within six months from the date hereof, the sum of two thousand dollars, then shall this conveyance be held void as to that part of the estate of the said J. H. Horner, as is now in the State of Missouri and at this time in the hands of the said W. H. Whitwell, his administrator with the will annexed, but shall remain in full force, even in case this condition is complied with, as to that part of said estate now in the

State of Tennessee, and all property of whatsoever kind, in any and every way involved in law suits, cases or controversies, in said State of Tennessee, and the parties of the first part do hereby constitute and appoint the said party of the second part, their and each of their true and lawful attorney, irrevocable, in their name and names and in their place or places, and in their stead or steads, for the purposes aforesaid to ask, demand, sue for, attach, levy, recover and receive the interest and interests of the said parties of the first part or of either of them in said estate and to all property, of what nature or kind soever, which is in anyway connected with or involved in said law suits, cases or controversies, giving and granting unto said attorney full power and authority to do and perform all and every act and thing, whatsoever requisite and necessary, as fully to all intents and purposes as we or either of us might or could do, if personally present with full power of substitution and revocation, whereby (hereby) ratifying and confirming all that the said attorney or his substitute or substitutes shall do or cause to be done by virtue hereof.''

Instrument ''B,'' as said, refers to ''A,'' was executed simultaneously as part of the same arrangement, was signed by Hunt and the same parties executing ''A,'' was in duplicate, was not recorded, and is as follows, omitting the signatures and acknowledgments:

''Articles of agreement made and entered into this day of June, A. D. 1885, by and between W. H. Whitwell and Mary J. Whitwell, his wife; Chase Gibbs and Elizabeth Gibbs (formerly Elizabeth Whitwell), his wife; R. W. Revelle and Henrietta Revelle (formerly Henrietta Whitwell), his wife; Randolph Revelle and Josephine Revelle (formerly Josephine Whitwell), his wife; J. F. Boss and Mosella Boss (formerly Mosella Whitwell), his wife; and A. Sidney Whitwell, parties of the first part, and A. W. Hunt, the party of the

second part, all of the county of Stoddard and State of Missouri:

"Witnesseth, that, whereas there is a suit, case or controversy, now pending in the United States Circuit Court for the Eastern District of Missouri, wherein Mary Horner, E. Horner, L. K. Horner, Sarah Craig (formerly Sarah Horner), Elizabeth Warren (formerly Elizabeth Horner), and George Horner are plaintiffs, and W. H. Whitwell, Mary J. Whitwell, A. Sidney Whitwell, Margaret E. Whitwell and Mosella Whitwell, are defendants of record, and Elizabeth Gibbs, Henrietta Revelle and Josephine Revelle, together with their husbands on account of the death of their sister Margaret E. Whitwell, which occurred May 28, 1879, are defendants of interest, which case is by No. 2373, and conducted under the style of E. Horner *et al.*, against W. H. Whitwell *et al.*, the subject-matter of which case, is the will and estate of the late J. H. Horner, who executed said will December 30, 1876, and died in Stoddard county, State of Missouri, January 2, 1877.

"And whereas, another case or cases is or are now pending in the State courts of the State of Tennessee, in Perry county, to all of which the above mentioned persons are plaintiffs and defendants either of record or of interest, as aforesaid, the subject-matter of all of which cases relate to the will and estate of the said J. H. Horner.

"And whereas, the parties of the first part herein, the defendants in said cases, either of record or of interest, as being legatees, or heirs at law of a deceased legatee of the said J. H. Horner, are desirous of having the said cases compromised or determined, or the interest of the said plaintiffs in said estate, or that part of said estate which is now in Missouri transferred to the said defendants, together with the power of attorney to W. H. Whitwell, authorizing him in their names to dismiss said case No. 2373, with costs against

said plaintiffs and their security or securities.   And whereas,

"Article I.  For and in consideration of the sum of five dollars paid unto the party of the second part, by the parties of the first part, the receipt whereof is hereby acknowledged and the further consideration of the covenants, grants, sales, conveyances, transfers and agreements on the part of the parties of the first part, and contained hereinafter in article (2) in these articles of agreement, and in a transfer and power of attorney this day executed and delivered unto the party of the second part by the parties of the first part, to which reference is hereby had, and which is intended as of the nature of a trust deed to secure the performance of the undertaking of parties of the first part, and each of them herein and for other purposes, the said party of the second part covenants and agree to and with the parties of the first part, within the next six months from the date hereof, to procure a transfer of all of the interest and interests of the living plaintiffs aforesaid and that part of the estate of the late J. H. Horner as is now in the State of Missouri and in the hands of W. H. Whitwell as his executor or administrator together with a power of attorney from the said plaintiffs executed and delivered to W. H. Whitwell authorizing him in their names to appear before the United States Circuit Court for the Eastern District of Missouri, at any practicable and proper time and dismiss said case No. 2373, and confess judgment against them and their security or securities for cost of suit.

"The said party of the second part further covenants and agrees to and with the parties of the first part, that he will hold them and each of them harmless from all further costs and lawyers' fees in the case or cases in the State courts of the State of Tennessee; but nothing herein is to be so construed as to bind the said party of the second part to pay any part of

the costs, or lawyers' fees, now accrued, or hereafter to accrue, in said case No. 2373, or to be in any way liable for the same.

"Article II. For and in consideration of the covenants and agreements on the part of the party of the second part as hereinbefore contained in article (1) in these articles of agreement, we and each of us the said parties of the first part, do hereby grant, sell and convey unto the said party of the second part his heirs and assigns forever all the interst and interests in that part of the estate of the said J. H. Horner which is at this time in the State of Tennessee, or in any way involved in the case or cases in the State courts of that State, together with all our equities, action and rights of action therein; and, further, when the covenants and agreements of the party of the second part, as contained in article (1), hereinbefore, shall have been fully performed, we the parties of the first part covenant and agree to pay unto the party of the second part, his heirs or assigns, the sum of two thousand dollars, for the payment of which, well and truly to be made we bind ourselves, our heirs, executors and administrators together with our entire estates in the estate of the J. H. Horner by said transfer and power of attorney aforesaid.

"Note I. The word (estate) is intended to comprehend property of every description.

"Note II. It is mutually understood that no part of the covenants or agreements on the part of the parties of first part are to be executed until all the covenants and agreements on the part of the party of the second part shall have been fully performed.

"Note III. It is mutually understood that the transfer and power of attorney hereinbefore referred to is intended to operate as trust deed only, so far as it relates to that part of the estate of said J. H. Horner which is now in Missouri; and the power of attorney does not confer any right on the party of the second

part to determine said case No. 2373 otherwise than as contemplated herein; and in the event the said party of the second part should be unable to perform all his covenants and agreements, then said power of attorney, together with these articles of agreement, is to be held utterly void, and of no effect in law or equity.

"Note IV. There is an interlineation of the words 'on account of the death of their sister Margaret E. Whitwell which occurred May 28, 1879,' between the nineteenth and twentieth lines of page one (1); and of the words, 'or that part of said estate which is now in Missouri,' between the seventh and eighth line of page two (2); which were made before the signing hereof."

It seems the Whitwells reposed multiform confidences in Hunt; e. g., as doctor, as lawyer, as present guest and as old-time Tennessee friend. And it seems said devisees and legatees were unlearned — some of them, at least Mrs. Whitwell, not being able to read or write — and that they, without reading documents "A" and "B," relied upon Hunt's exposition of their tenor and effect.

There was evidence from which the chancellor could have found, and likely did find, that he. secured documents "A" and "B" by working on the fears of the beneficiaries under the will, causing them to believe he (Hunt), therewith could and would end all the expense and uncertainty of pending litigation and save their estate. There was substantial evidence tending to show that, immediately upon the execution of documents "A" and "B," Mary Jane Whitwell turned over to him $1,000 in gold in a sack, the testimony showing that the gold was poured on the floor and Hunt got down on the floor and counted the money, put it in a sack and put the sack in his valise and carried it away to Tennessee to buy peace. There was also substantial evidence tending to show that the Whitwells and the devisees under the Horner will executed documents

"A" and "B" on the theory outlined by Hunt to them, that the two documents would secure the mother for advancing this $1,000 in the devisees' interest. Hunt admits the $1,000 was given him, but he says he did not take it to Tennessee. That within two or three days afterwards, at Captain Whitwell's instance, he paid his (Whitwell's) debts with it — thus leaving the inference open that Whitwell and Hunt conspired under cover of false pretense to get this money from Mary Jane Whitwell to loosen the Captain's yoke of debt, then galling a bit. But the evidence is conclusive to our minds, and doubtless was to that of the learned chancellor below, that he carried this identical money to Tennessee and there used it in making a settlement. En route he met an acquaintance who testified in his cause that Hunt asked him if he ever "hefted" $1,000 in gold; and thereupon he allowed the witness to handle the valise and feel the weight of the coin.

There was also evidence showing that the devisees understood from Hunt that he was willing to take the Tennessee part of the Horner estate, estimated at considerable value, in personalty as well as realty, for his fee. On the other hand, Hunt says his understanding was that he was to get the whole Tennessee estate at all events, and also the estate in Missouri, subject, however, to the redemption of the Missouri part by paying him $2,000 in six months.

Armed with documents "A" and "B" and with the $1,000 aforesaid, Hunt appeared in Tennessee and within a few days he got a conveyance from the Tennessee heirs to the Tennessee property and realized thereon $500 which he put (and kept) in his pocket. He also got from the Tennessee heirs the following conveyance and power of attorney, which he presently placed of record in Stoddard county, Missouri:

"This indenture, made and entered into July 7, 1885, by and between Elias Horner, Levi K. Horner,

Sarah Craig, and Elizabeth Warren, the parties of the first part, and A. W. Hunt, the party of the second part.

"Witnesseth, that for and in consideration of the sum of one thousand dollars paid unto the parties of the first part, by the party of the second part, the receipt whereof is hereby acknowledged, the parties of the first part, and each of them, have bargained, and sold, and by these presents do grant and convey, remise, relinquish, set over, assign and transfer unto the party of the second part, his heirs and assigns forever all the right, title, interest, claim and demand, both in law and equity, and all the actions, suits, cases, controversies and equities in the estate of the late John H. Horner, who died in Stoddard county, Missouri, January 2, 1877, and to whose estate the parties of the first part or all the heirs at law and of whose estate the said Elias Horner is the administrator in the State of Tennessee.

"To have and to hold together with all the property of what nature or kind soever, interest, claim, demands, actions, rights of actions, and equities of the said parties of the first part, in and to said estate and all and everything of value connected with said estate, or suits, cases, or controversies now pending, or hereafter to be originated in any court or courts of any of the States of the United States, and in court or courts of the United States unto the party of the second part, his heirs, or assigns forever.

"And the parties of the first part and each of them do hereby appoint and constitute the party of the second part their and each of their true and lawful attorney irrevocably in their name or names, place or places, and stead or steads for the consideration and purpose aforesaid to ask, demand, sell, attach, levy, and receive the interest and interests of the parties of the first part, and each or either of them in the estate of the said John H. Horner, deceased, and to dismiss any or all suits, cases or controversies, in any and all courts

at all the cost of the (of the) parties of the first part, and their security or securities which relate to the estate aforesaid or any part thereof or the subject-matter of which suit, case or controversy is an instrument of writing, dated December 30, 1876, purporting to be the last will of the said John H. Horner, deceased, and of which W. H. Horner of Stoddard county, Missouri, is administrator or executor and particularly and singularly is this intended to apply to cases No. 2373, in the circuit court of the United States for the eastern district of Missouri, wherein the parties of the first part are plaintiffs and said W. H. Whitwell and others claiming to be legatees and husbands and heirs of deceased legatee and defendants, giving and granting unto said attorney full power and authority to do and to perform all and every act and thing whatsoever requisite and necessary in and about the premises as fully to all intents and purposes as the parties of the first part or either of them might or could do if personally present with full power of substitution and revocation hereby ratifying and confirming all the said attorney or his substitute or substitutes shall do or cause to be done by virtue hereof.

"It is intended that this conveyance and power of attorney as hereinbefore set forth for the purpose mentioned shall fully bind such of the said parties of the first part as shall execute, subscribe and deliver the same without regard as to whether or not all of the said parties of the first part shall or shall not so subscribe, execute and deliver the same."

The result unblushingly contemplated by Doctor Hunt, or lawyer Hunt, or both, and attained (if his theory is to be adopted) is shown by a part of his testimony on cross-examination. We take it it is to the credit of two noble professions that a like example of heartless greed in the spoliation of an estate, has not before come to the attention of this court. Here is his theory of what was to happen and what did happen:

"Q. Why didn't you take that conveyance in Mrs. Whitwell's name, as you stipulated here in this agreement? A. We had abandoned that.

"Q. It was a matter of indifference to you? A. Yes, sir.

"Q. You were just as willing for you to have it as her? A. No, sir.

"Q. This paper says that you agreed to get a deed of conveyance from the Horner heirs in Tennessee to the widow Whitwell; now, why didn't you do that? A. She did not want that — she abandoned that.

"Q. She wanted it for you, did she? A. She wanted me to leave the deed to her for the place on condition that she pay $2,000.

"Q. And then it appears that she paid $1,000? A. I never credited that $1,000.

"Q. Why didn't you take the conveyance to her? A. Why, unless she paid the $2,000, she wasn't entitled to it — we changed it.

"Q. Then it turned out you got the estate from the Tennessee heirs? A. Yes, sir.

"Q. Real and personal property? A. Yes, sir.

"Q. And $1,000 of Mrs. Whitwell's money? A. Yes, sir.

"Q. And you got all the interest of the Horner estate in Missouri? A. Yes, sir.

"Q. Real and personal? A. Yes, sir.

"Q. And it did not cost you five cents? A. No, sir; it cost me coming out here on contract of $500, and taking the liability of all costs that would have subsequently accrued in the Federal court, and all the costs of the suits out in Perry county, Tennessee — it cost me all of that.

"Q. Did you pay one cent of costs? A. No, sir.

"Q. Will you swear here that you paid one cent of costs in Tennessee on account of that litigation? A. I think I did.

"Q. Will you swear that you paid one cent of costs in the litigation in the Federal court in this case? A. No, sir, I never.

"Q. Didn't you have the suits in Tennessee dismissed at the costs of the Horners? A. Yes, sir.

"Q. And also in the Federal court of the United States at the costs of the Horner heirs? A. No, sir; I never.

"Q. You had it done? A. No, sir.

"Q. Who did? A. Major Bedford.

"Q. He was acting for you? A. No, sir.

"Q. He was acting for himself? A. Yes, sir.

"Q. Now, is it not a fact that you got the entire estate of the Horners in Tennessee, and the entire Horner estate in Missouri, and Mrs. Whitwell's one thousand dollars, without paying out anything at all, excepting your attorney fee for coming here for Captain Whitwell? A. Yes, sir, that is it really; that is all I paid out."

An outline of the remaining record is this: Dr. Hunt presently appeared before the attorney of record of the contestees in the Federal court, exhibited his alleged title papers and powers of attorney, from contestants and contestees, and told said attorney he held both and did not want to "weaken either title." It also appears by inference that he showed these same documents to the resident attorney of contestants, Mr. Bedford, who about that time, or shortly thereafter, took the title to the land in suit for himself and for the benefit of Hunt. Hunt denied that he procured the dismissal of the will contest. But his conduct and the powers of attorney embodied in documents "A" and "B," as well as in the conveyance from the Tennessee heirs, and the present dismissal of the suit in the Federal court show that such dismissal was contemplated and brought about by Hunt and Bedford, who at that time was a co-conspirator of his. The date of this dismissal we have not discovered in the record. At about

this time Captain Whitwell died, and at about this time one Joseph Howell was murdered. The Howell estate also "got into chancery," it seems, and was beset with litigation; and Hunt during these times had a partner in the practice of the law named K., and K. became administrator of the Howell estate, as well as administrator *de bonis non c. t. a.* of the Horner estate after the death of the executor, Captain Whitwell. The evidence indicates that Hunt, Bedford and K., in the language of the day, "pooled their issues," went into a *partnership* to handle the Howell and Horner estates, then being administered upon by one of their number — in short, forming a sort of dead man's trust with each a finger in the pie for by-ends — each owning one-third, though the title was still left in Bedford. It seems, moreover, that deeds were made to K. for an undivided interest in both estates, but he never put them on record. Presently these men took in Thomas Howell, an heir of the Howell estate, and Bedford deeded an interest to him in both estates, which he thereafter re-deeded to Bedford. The evidence tends to prove that Bedford had notice of Hunt's dealings with the devisees under Horner's will and conveniently carried the title for the public eye, allowing Hunt and K. to remain in the background. Presently after K.'s death, they took in R. J. Jackson, another doctor, and he became a partner in this same scheme — Bedford deeding at first a two-thirds interest to him in 1889, and, finally, in 1893, conveyed to him the other third. We think there was evidence showing that Dr. Jackson, also, had notice of the secret interest of Hunt, the nature of his and Bedford's title, and of the general scope and character of the scheme for exploiting these trust estates. How this astonishing and sinister partnership of lawyers, doctors and administrators was wound up does not appear.

As part of the scheme, the old suit in the Federal court was revived by Hunt and Bedford and a judg-

ment was procured declaring the will of John H. Horner not his will. This judgment was without the knowledge and behind the backs of the devisees of said will, and it remained in existence for some time, when the devisees, becoming aware thereof, lodged their bill in equity in said court to have said judgment vacated for fraud. To this proceeding, eventually, Dr. Jackson, Dr. Hunt and Bedford, were made parties and, as we understand the record, after the taking of much testimony, which, first introduced in that case, was finally offered in the case at bar, a decree was entered setting aside the judgment entered in the Horner will case for fraud, and the will was established in solemn form as the will of John H. Horner.

While that case was pending in the Federal court, the devisees under the Horner will instituted a suit in the State court against Hunt, Bedford and Jackson to set aside conveyance "A," as we gather it, at least to clear up the title of the devisees to the premises in dispute. This suit was begun in 1891 and a notice of *lis pendens* was presently filed as provided by statute. Pending this latter suit and also pending the equity suit in the Federal court, Dr. Jackson placed the title to the land in controversy in his wife, Mary A. Jackson, and she was thereupon made a party to the equity suit in the Federal court and in the pending litigation in the State court. What became of the suit in the State court does not appear from this record, but the case in the Federal court, as we understand it, resulted, as said, in a judgment setting aside the former judgment annulling the will for fraud, and establishing the will.

Hunt, Bedford and Jackson were business associates and not only partners in this dead man's trust, but in other matters as well. The evidence tends to show that not only Bedford, as said, but Jackson had notice and knowledge of Hunt's scheme and were ready participants therein — in short, were all tarred with the same stick. The same evidence shows that fraud

in its most repellant form leaves a trail like a serpant over this whole case.

The testimony, furthermore, shows that the deed to Mrs. Jackson was a mere voluntary conveyance. No money was paid. It seems that in 1894 at the time of the conveyance to his wife, Dr. Jackson's conscience was pricked and he conveniently remembered that twenty-two years prior to that he had appropriated many thousand dollars' worth of his wife's property. Therefore, he says, he conveyed to her the real estate in controversy, with other lands, to wipe off this old score. His wife held no notes, no account was kept between them, the appropriation of her estate was done with her acquiescence, she never expressed or indulged any solicitude over it, and made no demands of her husband for repayment then, or at any time. She was the passive receptacle of this tainted title — was mere clay in the hands of a potter, and that potter, her husband. Not having procured the conveyance to herself, the conclusion is irresistible that no blame is to be attached to her, her husband merely using her name, if the simile be allowed, as a harbor to escape adverse gales then blowing his treasure-ship, laden with the spoils of piracy, upon the rocks of justice.

On the issue of the Statute of Limitations the evidence is very unsatisfactory. On the other hand, evidence was introduced tending to show adverse possession since 1876 in the devisees under the Horner will; contra, there was evidence tending to show that three small parcels of the land, aggregating three acres, were deeded away by Jackson and passed off to parties who are now in possession. So, too, there was evidence that, first K., as administrator of the Horner estate, and then Bedford, as his successor, were in possession and collected rents for the benefit of that estate on the land in suit, at any rate, on part of it, up to the time of the final settlement of Bedford as administrator, to-wit, a few months before this suit was begun.

OPINION.

On the above record, respondent contends that no issues of law are involved and we sympathise with that view. The statement of facts would seem to carry with it and foreshadow, in this instance, the only conclusion that a court of conscience could entertain, hence, argumentation and authority are superfluous. Hunt held peculiarly confidential relations with the devisees under the Horner will. Hence, any one, charged with notice, holding under contract and conveyance "A," carried the burden of showing it was fair. This burden was not carried successfully.

It is a far cry from what the ethics of an honorable profession will allow, to what Hunt did, as conclusively established to the chancellor below, and to this court. On the other hand, the burden was on respondent Glenn to show that Bedford and Jackson had notice of and participated in Hunt's covinous contrivances. We think that burden was successfully carried by respondent Glenn. So, too, the burden was on respondent Glenn to show that the conveyance to appellant, Mary A. Jackson, was voluntary and was part and lot of the general schéme to defraud. We think Glenn carried that burden successfully, also.

Appellant is in a court of equity and must come with clean hands. This she does not do, under the facts disclosed. Her claim is not only stale, but is tainted with the frauds of Hunt, shared in by Bedford and her husband. Evidently, the dangers of pending litigation caused the title to be put in her, in the vain hope, entertained by her husband, Bedford and Hunt, that she could plant herself under the folds of the flag of an innocent purchaser. An innocent purchaser she is not, as that term is recognized in equity.

If conveyance "A," under which she holds, be considered a deed with a clause of repurchase, or a mort-

gage, it matters little, because its fate is inexorably sealed in equity and it must be cut up root and branch.

The decree of the learned chancellor, *nisi*, was right and is, therefore, affirmed.

*Brace, P. J.*, and *Valliant, J.*, concur; *Graves, J.*, not sitting.